Good morning. Good morning. May it please the Court. My name is Ken Kieffer. I'm here on behalf of Dr. Leon. We have, of course, cross appeals. I'd like to spend 15 minutes on Dr. Leon's appeal of the sanctions motion and reserve five minutes. I would also point out to the Court that there is a protective order which was entered by the district court in this case with regard to certain materials, and it was applied to materials in the excerpt of record by an order of this Court. And I will steer clear of the specifics of the matters covered by that protective order. I want to start my presentation by acknowledging that in his end of discovery conduct below and in an isolated incident, Dr. Leon engaged in regrettable conduct, and he is deserving of a sanction from the district court. However, in this case, the ultimate sanction which was imposed, that is a dismissal with prejudice, bringing with it, of course, the luggage of, perhaps it's good luggage, of due process concerns, denial of due of a jury trial and denial of a day in court was excessive and was particularly excessive when combined with a monetary sanction of approximately $65,000 and subsequently $29,000 in costs. The cost issues are not here before you, but I think they are relevant. But the total sanctions here, the sanctions would cost pretty close to $100,000. Well, let me, I think obviously from the standpoint, you know, having previously been a trial judge, obviously you try to impose a sanction that will, you know, you have certain things that you have to go through, but that will also be appropriate, but you try to impose the least sanction that's going to accomplish your goal. But here in, you know, I guess what you need to address, it is the harshest sanction, no two ways about that, and I think that that should only happen very infrequently. But here where you have someone essentially destroy all the evidence, what else could you do? Well, Your Honor, the record is clear that Dr. Leon did not destroy all the evidence here, and that's one of the things I wanted to get to. The case law, I think, is very clear and it's well discussed in our cases. But a lot. Some. And it can't be recreated. Clearly some.  There is a question which we should. The problem is even if it's only some, it's, you know, it's clear that some probably contained evidence relevant to some of the claims, and there's no way to tell, you know, how relevant it was. Your Honor. There's no way to know. There is no way to know with any certainty, Your Honor. But I think it's important here, and if you look at the Payne decision, and Judge Payne versus Exxon decision out of Alaska, where the court emphasized that the conduct of the person who was sanctioned should be taken in the context of all of the discovery conduct of that person. And here the record is clear that there were no motions to compel whatsoever prior to this one. There was a full discovery day. It lasted for over a year. There were over several hundred requests for admissions, which Dr. Leon answered. There were no motions to compel on any of those. There is, of course, a seven-hour limit on depositions here. Dr. Leon agreed to a virtually 21-hour deposition over three days. There was a wide array and panoply of evidence on every conceivable issue. We also have the problem of it wasn't accidental. That obviously in imposing sanctions, too, let's say someone accidentally deleted one file, that would be different than purposely deleting many. That is true, Your Honor. And so you've got that because apparently he admitted that he did that. They knew what he was doing. It wasn't that when you accidentally sometimes you hit a key and then you spend all day trying to recover that document that you've been working on. And so it's not that situation. And it's also he was allowed, they entrusted him with keeping the computer while things were going on, but saying don't take anything off it. And then what does he do? Was it 2,200 or something like that, files? It was done at the end after all of the other discovery had been had, Your Honor. And I would encourage the Court to look at the record before you as to the full array of discovery that was had here before this unfortunate incident took place. I think when you look at the cases, and particularly I would direct the Court's attention to a district court case, the AdvantiCare decision. There were, of course, two AdvantiCare decisions, and I'd like the Court to look at the first of those two, where there was intentional deletion of files after court orders in that case. And even under those, and over several times, but under those circumstances, the district court determined after a full analysis of Ninth Circuit law that the – it was not extraordinary enough circumstances to warrant the final dismissal. In the AdvantiCare decision, the Court also reduced the monetary sanctions of about $65,000 that were requested to about $20,000. It is very close to the case here. It's fine to say the district court did not abuse its discretion in that case, and I wholly agree. But it's another thing to say, because one district court took that action. Another district court couldn't take some other action. I completely agree with that, Your Honor. But I think when you look – That's the burden of your argument. I'm sorry, Your Honor. That's the burden of your argument, because this district court did something less or, you know, this is excessive. And that's why I would ask the Court to look at four cases in particular and measure what the conduct that happened there and the sanctions that were – were placed upon the destroying party and what Dr. Leon did here. And those four cases, and they're discussed at our opening brief in detail at pages 22 through 27 by the Ninth Circuit's decision in the Bratki case, the Ninth Circuit's decision in the Anheuser-Busch case, the first AdvantiCare decision in the Northern District of California, and the Payne decision, which you sat in judgment, Your Honor, back in 1997. And the themes that emerge from those decisions, and there are others, but those were the most closely analogous to what happened here are, as the Court has recognized here, and of course it's perhaps too obvious to even say, and that is that dismissal is a drastic sanction and is only allowable under the most extreme of circumstances. The Ninth Circuit and district courts within the Ninth Circuit have struggled to come up with what a definition of extreme circumstances is in exercising their discretion. And the themes that emerge from the Bratki, Anheuser-Busch, AdvantiCare, and Payne decisions, and certainly others, are that there has to be, in order for there to be dismissal, a pattern of deceptive or abusive conduct. There has to be grounds for anticipation of future abuse. And perhaps most importantly, that Cardi's conduct needs to threaten and to entirely eclipse the possibility of a fair trial. And we would respectfully submit to the Court that the district court abused its discretion in finding that under these circumstances, where there were hundreds of requests for admissions answered, over 24 depositions, thousands and tens of thousands of documents exchanged, that there was no possibility of a fair trial under these circumstances. That conclusion cannot be reached under this record. We would also point out to the Court that Judge Peckman conceded at the CR-151 at the motion on sanctions that she had not taken into consideration any of the motions for summary judgment or evidence motions which were before her at the time she decided the motions for sanctions. It is uncontested that prior to this hearing on the motions for sanctions, the district court had had very little opportunity to become involved in this case, even though we were close to trial at the time the sanctions were imposed. There was a hearing on coordinating the two cases. It was originally IDX's cases, and then cross-claims or counter-claims, rather, were brought, and who was going to be the plaintiff, and on case scheduling. But that was it. So the entire array of facts which the Court has before you in the first 15 or 20 pages of our brief with regard to the retaliation and the facts supporting that retaliation, the district court, by her own admission, simply did not take into consideration And that's at ER-151. And under those circumstances, we submit that it was an abuse of her discretion to determine that she could not fairly try the issues when, and we understand, but through her own admission, she simply had not looked at what all of the issues were in this case. And what the evidence was, and there was a significant amount of evidence in the various motions for summary judgment, which she expressly chose not to read, and she told us that. We also submit that the Court submitted error when she failed to take into consideration an unclean hands defense, which Dr. Leon raised in the briefing before her and an oral argument on the motions for sanctions, pointing out that IDX had also not produced the documents, and if they approach this motion for unclean hands, they're not entitled to a dismissal or perhaps to discovery sanctions. But the Court declined to reach that. And finally, we feel that the district court abused her discretion in granting the $65,000. Kagan. Where do you think that the district court was deficient under Yagman? The Yagman case? Yes. I think she simply did not take all of the factors into consideration. And in the panoply of factors that were set forth in the Ninth Circuit decisions and in AdvantiCare, she simply gave us the ultimate sanction here, along with sanctions and $65,000. So which things did she ignore? Did she deal with deterrence? Did she deal with ability to pay? I don't think she dealt with ability to pay. And we pointed out at oral argument that Dr. Leon had not been employed for over a year at this time, at the time that the sanctions were applied. And I think she also did not adequately consider the public's interest, favoring disposition of their cases on the merits. And certainly, I don't think that she adequately considered the availability of less drastic sanctions. The availability of what? Less drastic sanctions to deal with this specific type of conduct. Well, now, I think you've kind of gone back and forth a little bit between the setting the $65,000 amount and ordering the dismissal of the action. Correct. I thought we might have moved to the $65,000 question. I was about to move to that, but I wanted to respond to Judge Gallagher's  I agree. There seems to be a lack of consideration on your client's ability to pay the $65,000. There does not seem to be discussion of that in the record. Am I correct about that? You're correct. We pointed out that he had been unemployed for a year, and we pointed that out at the sanctions argument. But in addition to that You say you pointed it out at the sanctions argument? Yes, we did. In the district court. And what did the district court say? There was no response from the district court with regard to that factor. Well, then she heard it. I guess she just didn't think it was I think that cuts against you in the sense I am inclined along the lines to say that the sanctions perhaps the factors in Yangman needed to be better considered. But if you say to the district court, hey, I haven't worked for a year, there was some consideration of a person's ability to pay then. It was raised. Whether it was considered or not is not clear on this record. When you say it was raised, what kind of showing was made to the district court about, you know, financial conditions? I raised it during oral argument, Your Honor. But raised it. What do you mean by raised it? Or my client can't pay? Or what did you say? I told the court that the client was not there that day because he couldn't afford to come up for it and that he had not worked for a year. Well, but what were his assets? I'm sorry, Your Honor? What was his balance sheet? What were his assets? That was not submitted to the district court. Well, then how can the court make a decision without that kind of information? That was not submitted to the district court. Aside from the client's ability to pay, I think when you look at the underlying documentation with regard to the $65,000, you will find that a great number of those services, but you can't really extricate which, were devoted to typical discovery things, like taking Dr. Leon's deposition, as well as other discovery tasks. And the district court did not require a showing, and simply had no showing on the record before it, that all of those $65,000 were devoted to, in their attorney's fees and also costs of experts, were devoted to the spoliation issues. And we would ask for a remand on that basis, too. That's the next thing. The $65,000 was to, what, compensate or to refund or get paid back to the other side the amount of money that gets spent in trying to get the case dismissed or? It was allegedly on behalf of services devoted to the spoliation issues, Your Honor. The spoliation issues. Right. And did they, what, present some sort of schedule of the fees that had been incurred by them in the spoliation issue? They did, Your Honor. And I have the site at the table, if you'd like. It's in the ER, in the excerpts of record. And then the district court considered that and said, well, I'm going to award $65,000. She awarded every penny that they sought. And there, too, I would ask the court to look at the AvantiCare decision, where, strangely enough, there had been destruction of evidence thereafter court orders, unlike here. $65,000 in sanctions were sought, just as they were here. The district court, and it was admittedly the district court, reduced that sanction to $20,000 rather than $65,000. Do you want to reserve the balance? I do. Thank you. Thank you. Good morning, Your Honors. Good morning. May it please the court, I'm Angelo Calfo on behalf of IDX Systems Corporation. I'm here with my colleague, Jordan Gross, sitting at counsel table. Are you going to use all the time yourself? I am, Your Honor. Okay. Your Honors, the district judge in this case dismissed Dr. Leon's claim after finding that he deleted files from his IDX's company-issued laptop computer. This is an employment case. He deleted those files over a period of one year. He deleted those files. He deleted more than 2,000 of those files. When he deleted the files, he did not take any care to identify what it was he was deleting. He deleted them indiscriminately, directory by directory. And what's more, not only did he delete the files, he then, using his own computer expertise, developed his own program. The purpose of creating the program and then running it on his laptop was to make sure that IDX and the court and the jury were never going to find out what it was that he deleted. So he wiped it, too, is what you're saying? He wiped it. And this is what our, you know, IDX, in order to, it's also important to sort of review how we came to know this. This wasn't a situation where there was a confession by Dr. Leon during the discovery proceedings that I did this. It was a situation where the case had been pending for many, many months, close to a year. So there had been initial disclosures by the parties. There had been interrogatories, as Mr. Kiefer has pointed out, and other discovery proceedings in the case. Dr. Leon didn't respond to those interrogatories on his initial disclosures and let us know that this is what he did. Instead, after negotiating with Dr. Leon and his counsel for more than a year to try to get this laptop back, and he held onto it as long as he could, he gave it back to us. And this is in the record. He had the temerity to say, I'm really worried about giving you this laptop, and this is in the record, because I am concerned that you'll do something to compromise the integrity of the information on there. I mean, this is the attitude this plaintiff had toward the litigation. Once we got the laptop, we did, I think, what a lot of responsible lawyers would do defending a case like this. We had somebody take a look at it to see, you know, why did it take us so long to get it? What was it that was so important on here? And it was through the use of this forensic expert that we found out there had been this wiping program applied and that the only thing that was remaining with respect to the files that had been deleted were just the names of the files. I mean, we couldn't get the substance of the files, but we could see the names. And one of the things Judge Peckman noted in her dismissal order is that with respect to looking at just the names of the files, the court could determine that some of them had to do with his employment at IDX and with respect to the very program that was at issue in the case. Well, obviously the court issued the harshest sanction. I mean, this is the death penalty of civil cases. And so why is this the only sanction that could be appropriate? And it clearly wasn't. I think the district judge has a wide discretion to determine what the appropriate sanction would be. But why is this the only one that's appropriate here? Well, I don't think it's the only one. But I think when the standard of review here is the same. Well, if they could have done something less, then they should have. Well, Your Honor, I mean, I think you're right. If your rights could have been protected with something less, then it would be too harsh. Well, I don't know that I am. The second question I think I don't agree with. Could it be protected by something less? I guess my sense is the answer is no to that. Could – would I be up here arguing that it was the only possible thing a district judge could do? I don't think I could reasonably say that. But I do note that the standard of review here is an abuse of discretion. And really the question here is, was the judge's decision beyond the pale of reasonable justification under the circumstances? And, you know, the point to my introductory comments was, you know, this was egregious conduct. It wasn't an isolated incident. It was conduct that took place over a very long period of time. And the fact that it was egregious, the fact that it was willful, the fact that the Court found that Dr. Lynn was acting in bad faith, put aside prejudice, put aside any other factors the Court considered, this Court has held that in situations where the conduct is willful and egregious and in bad faith, that alone gives the Court the discretion to make the decision that there should be a dismissal. And I point the Court to the G.K. Properties decision. And I think the language in this decision is very, very apropos here. The Court there – and this was written by Judge Kennedy, now Justice Kennedy – and there he said, Where it is determined that a counsel or a party has acted willfully or in bad faith in complying with the rules of discovery, or in flagrant disregard of those rules, it is within the discretion of the trial court to dismiss the action. Here the Court dismissed the plaintiff's action with prejudice. We encourage such orders. I mean, a district judge – and this is, of course, the case we presented to Judge that in this circumstance, not only does the Ninth Circuit give you discretion to dismiss the case, they're telling you, we encourage you to dismiss it. And why do we encourage you to dismiss it? The G.K. Properties also answered that question. They said, in these kinds of conduct, there's impermissible prejudice that naturally flows from the conduct. And we also are taking out the Court's resources to address – to direct those resources toward people who are going to act appropriately and in accordance with the Court's authority. Well, if I were in your position, I think I would make the argument, I mean, how can you try a case when you don't know what you're trying? I mean, as far as that goes. But then also, you know, as participants in the system, we expect a certain level of conduct regarding the behavior of people. And if we condone everyone destroying the evidence, so to disadvantage the other side in the litigation, it goes to the very heart of the integrity of the system. I don't need a lot – I don't know if my colleagues need more argument on that particular point. I don't. But I would like you to turn to what the Court considered for the $65,000. It did not seem – it seemed to be fairly cursory. Well, Your Honor, we – It may be reasonable, but it has to – you have to consider other things rather than just that it's reasonable. Yes, Your Honor. We submitted an affidavit in connection with our motion. The affidavit is quite detailed and explains what it is that we did to try and identify the existence of Dr. Levin's willful destruction of evidence. We listed each of our time entries in detail of lawyers, paralegals, experts. We not only listed them by chronological order, we broke them down by subject matter, explaining to the Court that these related to conferences, these related to meetings with experts, and so forth. Well, I guess the Yagman case, did the Court consider – doesn't the Court need to craft a monetary sanction to effectuate the goal of deterrence? Was that considered? And don't you have to consider the financial resources of the sanctioned individual? Was that considered? Well, and the point of my initial discussion was the basis of the 65,000 was submitted. The Court's order can't be read as anything other than an attempt to punish Dr. Leon. And that was the point of my earlier discussion. I agree with you, Your Honor, that there's certainly other reasons why I should be arguing that dismissal was appropriate. But I read Judge Peckman saying, hey, we're punishing this person for the conduct. That's one of the – that is, in my reading of it, is the primary reason why she dismissed the case. I guess this lawsuit's over. What more do you have to deter him from? Well, Your Honor, I mean, the extent of punishment is a question that can be debated. She thought that the appropriate punishment ought to be dismissal. And I'm not going to let you – I'm not going to – I'm basically going to compensate the other party for the cost of having to investigate your misconduct. And so I think with respect to the financial resources, the Court's opinion noted that Dr. Leon made $160,000 a year at his job. And he's earning $60,000? $160,000 a year. That was his salary at the – But he hadn't worked in a year. Well, that may be true, Your Honor. But I think it's important to note that the only reference to the financial situation of the defendant, of Dr. Leon, is that he was making a substantial sum of money while he was employed. And, you know, in addition – Could other things have been put on? There was discussion about there was no assets put on. There were – any of those things. Could those things – was there – was that opportunity denied at the hearing? No, Your Honor. The Court held an evidentiary hearing to discuss this matter. We brought our experts. Dr. Leon didn't even show up. And the Court noted that. So – and there was no discussion, no offer of proof, no evidence, no testimony that Dr. Leon couldn't pay this. There just simply wasn't. There was a proffer by counsel that he wasn't here for – I can't remember, frankly, if he said he wasn't here for financial reasons or not. But it was in evidence. And there – you know, I – Mr. Keefer said at the hearing he brought up the issue about the inability to pay. And what was in the record to support that? Nothing, Your Honor. So just argument? It was just argument. I assume that you could probably comb through the record and find a statement by Dr. Leon that I haven't been employed for some months. Aside from that, there was no – and I think there's – you know, there's a big – there's good reason to wonder what were his assets. I mean, there was also testimony that in the middle of his employment with – I mean, there's also evidence in the record that during his employment with IDX, he lifted up, sold his home in the Seattle area and purchased another home, a very expensive home in San Diego, without telling his employer. I mean, so there certainly was evidence in the record that this was a man who had some means. And there wasn't evidence in the record that he was destitute or couldn't pay. One of the questions that came up now as well, litigation is over. What else can happen? But you still have that – you still have that Labor Department proceeding opinion? Yes, Your Honor, and that's the subject of our appeal. And essentially what we asked Judge Peckman to do is now you've made this decision to punish Dr. Leon, and she also made the decision that, you know, this case can't reliably be tried because of the prejudice to IDX. It's a judgment on the merits. And here Dr. Leon has an identical retaliation claim pending in front of the Department of Labor. And we asked the judge, you know, to avoid inconsistent results, potentially inconsistent results, to avoid our having now have to defend the same claim in front of the Department of Labor. We request that you issue an injunction under the All Writs Act to enjoin further proceedings, not only of the Department of Labor, but also of Dr. Leon. We asked her to issue an injunction against both parties. Judge Peckman, the understanding of the Labor Department's authority was that – I think this is correct – that they could do more than Dr. Leon could do individually. Is that right? They could seek further relief? Something like that? Your Honor, I don't believe she said that. I think her reasoning was that there was an interest that the Department of Labor had that was broader than Dr. Leon's purely private interest. And what we're – what our argument is before this Court – Because they have an interest in how IDX does their work, generally, besides just whatever they did to Dr. Leon, right? They certainly do, Your Honor. And, you see, I think the problem with the analysis – the analysis here is, is there privity? And I think what courts look at in the question of privity is, you know, does the government agency in this instance essentially representing a private party, and the private party is pursuing private remedies? And what courts have found is that when a government agency is seeking the same relief that a private party has already tried to seek in private litigation and lost, or won, for that matter, that the agency shouldn't then go out and litigate the same thing. And there's two cases we cited that I think are really closely analogous to this case. It's very, very similar facts. One is called Chau. The other case is called Donnelly. And in those cases, the courts came up with this test. The Ninth Circuit case in Chau, they talked about, is there a divergence of interest between the government agency and the private individual? In the Donnelly case, the court talked about whether or not there was a – whether the purely private interest predominated what the agency was after. And if you look at the Sarbanes-Oxley Act and these anti-retaliation claims, and we ask, okay, what is it that the Department of Labor can get if they win everything? And the only thing they can get is the ability to make the employee whole. That's it. They can get back pay. They can get reinstatement and so forth. There is no provision in Sarbanes-Oxley that allows the Department of Labor to get any kind of public relief apart from making the employee whole. And, you know, in that circumstance, these cases, the Chau case, which dealt with a Department of Labor proceeding, Donnelly case, which dealt with a government agency action by the NLRB, those cases say res judicato applies to the government agency's proceedings. And, yes, we know the NLRB has a very important function, that they serve the public interest. And we know the Department of Labor in the Chau case serves a very important function. But the mere fact that an agency acts on behalf of the public generally doesn't give it the divergence of interest that prevents it from being in privity with that private individual. There has to be something more. And what courts have, you know, there's something more in the cases where res judicato doesn't apply are things like the ability to bring a class action lawsuit, the ability to get injunctive relief, and the like. And I think it's the law is quite clear. The Department of Labor in the Sarbanes-Oxley retaliation, anti-retaliation claim cannot bring its own lawsuit. It has no independent right to bring a lawsuit. It cannot bring a class action. It cannot seek injunctive relief. The only thing it can do is make whole relief for Dr. Leon. So why should the agency now pursue a judgment on the merits, I mean pursue a case that's already been judged on the merits, to obtain the same relief that he was denied in the Federal District Court? Well, that's one of the problems that it's been denied on the merits. His claim was thrown out. It was dismissed because he destroyed evidence. But there really was not a hearing on the substance of his claim. I don't think that's ever been determined. Now, the Department of Labor might have an ability to go forward and maybe under the rules of the Department of Labor or under the Act consider his claim and make some disposition of it that's different from what might have been made by the district court had the district court heard all the evidence. I guess what I'm saying is that maybe he's entitled to a hearing or to proceed before the Department of Labor, and if the Department of Labor is going to throw him out because he destroyed some evidence, maybe that's the decision the Department of Labor should make under its rules. Yes, Your Honor. What's wrong with that? Well, I think the problem is that there's a definition for what is a judgment on the merits for race judicata issues. And it's quite clear under the law that a judgment, a dismissal order or a default based on discovery abuse does constitute such a judgment on the merits. And Dr. Leon didn't take it kindly. Well, he didn't label a dismissal with prejudice. I'm sorry, Your Honor. If it labeled a dismissal with prejudice. Yes, Your Honor. And it was. And Dr. Leon didn't contest this issue below. We made the issue, and Judge Peckman found we were right. So I think there's an intuitive, obviously an intuitive, appeal. But she denied it based on the privity of the parties. She denied it not on the judgment, the issue of judgment on the merits, but rather on the privity of the parties. And, you know, the thing that she focused on mainly was DOL's ability to approve any settlement. That was the thing when I read the opinion. Ability to approve what? Ability to approve any settlement in the agency proceedings. And she said, well, that shows there's a broader interest than just Dr. Leon's. And I guess what we would say is really it doesn't, under the Chow case and under Donnelly, when they're looking to see whether the individual interests predominate or private interests predominate over the public interests, the mere fact that the agency may approve a settlement that is only aimed at make-whole relief doesn't really make the agency's interests predominate over the individual's, because ultimately all you're doing is giving the individual the make-whole relief, whether you approve it or not. And I think what this, you know, the basis of this approval of settlement issue is, when you look at the Sarbanes-Oxley Act, there's a definite concern by Congress when you review the statutes and the Department of Labor in their regulations for unrepresented whistleblowers. And this is why the Department of Labor can act as a party, their own option. They say in their own regulations we aren't going to do this very often. But the regulations say the reason we're going to do it is because if there's unrepresented whistleblowers, we want to make sure that they're being treated fairly. And that's why they also have the settlement provision. But it's all aimed at one thing, and that is to get the employee who had been retaliated against the money back. So we believe that Privety ruling by Judge Peckman was incorrect, and we ask the Court to reverse that and to find that res judicata principles do apply, and that the adjudicated proceedings in front of the Department of Labor, which are going to require us, having already won in federal court on this same claim, seeking the same relief, we shouldn't have to go to the Department of Labor now and say, well, he's a spoliator, and make all the arguments we made on our summary judgment motions and so forth when we've already won. And it's going to waste resources. And you know what, Your Honors? You are the court that is going to hear that case again. Because if you go to the Department of Labor, then whether you decide to win, somebody is going to appeal. And ultimately, after it gets to the board, the secretary. All right. Your time has expired. Thank you for your argument. Thank you, Your Honors. I believe I have about four minutes left, and I'd like to divide them equally to reply with regard to the five minutes and 26 seconds. I'll try to use four of it, Your Honor, if I may. I'd first like to address some remarks to the sanctions decision and to the factors which the Court did not take adequately into consideration in giving us the difference. Well, I guess the more that I'm thinking about it, though, if I'm thinking about who can say they can't pay. It's not something they can say. That's something that's in your ballpark. If someone can't pay, you did make the bold assertion, but you're the one that's a – well, your side, anyway, or Dr. Leon would be the one in the position to show what his assets are, to show that he doesn't have anything. And he didn't show up, and he didn't do that. The issue of the $65,000 and the petition that was filed by counsel is set forth in the excerpts of record, and it begins at ER 98. And you will see on ER 99 that declaration, along with a multi-page attachment with regard to the services rendered, was filed before the district court on the afternoon of the oral argument. When we walked into that courtroom, we had no idea that they were asking for $65,000 or how they would substantiate that. It doesn't mean at the hearing you can't ask Lee to, you know, file an affidavit. Sorry, Your Honor? It doesn't mean that at the hearing you can't ask the district court for Lee to file an affidavit after the hearing. Right, and the record did show that we did ask the district court to allow Dr. Leon to appear and offer testimony after the hearing. That's different, though, you know, because he never showed up. After the hearing, and we found out about the $65,000, before we found out about what the court's decision was, we filed a brief, I believe it was on September 9th. It's in the record. And we asked the court to reopen the hearing and allow Dr. Leon to appear, and the court declined to do that. The first time we found out about the $65,000 and the detailed fee petition was moments before the hearing began on September 8th of 2004. We were not ready for that, admittedly. But we didn't know about it until we walked into the courtroom. But you know, though, you knew before that, that IDS was seeking sanctions, right? We did, but we had no idea of the monetary, the scope of the monetary sanctions that they were seeking until moments before the hearing began. Your Honors, I think it's important, in fact, I know it's important, to take a look at the testimony as to why Dr. Leon did what he did. And it was out of perhaps a misguided, but a deeply held desire to not produce some material which was of questionable nature. Under those circumstances, what he did was- But he didn't just delete the pornographic material that he had on his work computer. That wasn't the only thing he deleted. They can tell from it that he deleted work files. He deleted too much. But his goal in doing all of that, and it was- Were 2,199 pornographic and one was work? I can't give you the exact breakdown. All right. Well, but there's also, too, that doesn't make it great because you probably can get fired. I'm pretty sure you can get fired for having pornographic material on your work computer, right? There is nothing in the record about IDX ever having fired anybody for that, Your Honor. And there was discovery on those issues. Of course, we raised that in discovery and in our depositions of IDX PR people. I would point out to the Court, Valley Engineers v. Electric Engineering Company, which is a Ninth Circuit decision from 1998, considering when the Court can exercise its discretion and give the death knell to civil claims. And the Court there said it's at 158 Fed Third at 1057. Dismissal is appropriate where a pattern of deception and discovery abuse made it impossible for the district court to conduct a trial with any reasonable assurance that the truth would be available. That was not the case here. It is not the case in the four cases that I gave you before, the Brodman or Brodby, Anheuser-Busch, AdvantiCare, and the Payne decision. And lesser sanctions. And we suggested to the Court an adverse interest – adverse inference instruction might be appropriate. That might still be appropriate. But giving the death knell was not. With regard to the All Writs Act, if you reverse on the sanctions, of course, you don't need to meet – you don't need to deal with the cross-appeal. I would remind the Court, as the district court clearly held, exercise of discretion under the All Writs Act is clearly discretionary and only under the most extraordinary circumstances. Twice – yes, Your Honor. I'm curious about the fact that, you know, the Labor Department doesn't seem to be interested in how we rule on this issue. The Labor – I'm sure they know this appeal is going on, right? They do. And there are two letters from the Labor Department to the district court which are part of the excerpts of record. Right. But they have no interest in the appeal. They have not filed anything with the appeal, but there are the two letters which they submitted to the district court, one of which she relied on heavily in a ground I'd like to address in my last remark, are before the Court in the excerpts of record. We believe that she ruled properly under the – Did you – did you contact them after the appeal was, you know, noticed? We did. We did. And they indicated they weren't interested? We never got any response from them, Your Honor. We believe that the district court properly determined that there is no privity here between Dr. Leon and the Labor Department. However, even if the court were to decide that there is privity, I would urge you to look at the very end of the district court's decision on April 7th of 2005. It's in the record at the supplemental excerpts of record at page 176. I'm sorry. The supplemental excerpts of record filed by Dr. Leon at page 56. And the district court said, and I quote, the Department of Labor made its point in its first letter to the court regarding this matter, that should OSHA's investigation get to the stage that the parties are faced with litigation before an administrative law judge, IDX will have the chance to present that judge with its res judicata arguments. This court's use of the extraordinary all-writs power before that moment is premature. I think she was correct in that decision. All right. Well, I think that's a good place for you to wrap up. And that is where I want to wrap up, Your Honor. All right. Thank you very much, both of you, for your argument. These matters will now stand submitted. The court's just going to take a five-minute recess, and then we'll resume with the last matter. All rise. This court stands to recess for five minutes.
judges: Thompson, Tashima, Callahan